UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SCOTT FRYBARGER, | : | CIVIL ACTION NO.: 3:22-cv-01652-VAB |
| Plaintiffs, | : | |
| v. | : | |
| JOSEPH SALEMME, | : | FEBRUARY 6, 2024 |
| ONE WAY LIMO.COM, INC. and | : | |
| LUXY TECHNOLOGIES, INC., | : | |
| Defendants. | : | |

## SECOND AMENDED COMPLAINT

### STATEMENT OF JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332, based upon diversity of citizenship. This action was originally filed by the plaintiff, Frybarger in State Court in Broward County, Florida and removed by the defendants, Salemme and One Way Limo.com ("OWL") to Federal Court based upon diversity of citizenship. The amount in controversy exceeds $75,000, exclusive of interest and costs.

2. Personal jurisdiction exists over all Defendants because Salemme resides in Connecticut, while OWL and Luxy Technologies, Inc. ("Luxy") are Delaware Corporations with their principal places of business in Connecticut.

3. Venue is proper in this District under 28 U.S.C. §1391(b)(1) as all Defendants reside in Connecticut.

### THE PARTIES

4. Plaintiff Frybarger is an individual who resides in Hollywood, Florida.

5. Defendant Salemme is an individual who resides in Shelton, Connecticut.

6. Defendant OWL, upon information and belief, is a corporation formed under the laws of Delaware with its principal business office in Shelton, Connecticut.

7. Defendant Luxy, upon information and belief, is a corporation formed under the laws of Delaware with its principal business office in Shelton, Connecticut.

## ALLEGATIONS COMMON TO ALL COUNTS

### The OWL Relationships

8. Frybarger and Salemme have been friends since childhood and each reposed trust and confidence in each other for many years.

9. Prior to 2014, Salemme formed and operated OWL. OWL's business contracted with limousine providers to offer customers discounted limousine fares in Connecticut, New York, and New Jersey. In 2014, OWL's business was struggling and on the verge of collapse.

10. Since 2014 and before, Salemme has owned and continues to own, substantially all of the shares of stock in OWL, and serves as OWL's chief executive officer and as chairman of OWL's board of directors.

11. In or about the winter of 2014, Salemme began communicating with Frybarger about OWL, its business opportunities, its possible improvement, and expansion to a nationwide "discounted limousine exchange" and whether Frybarger might help by investing in OWL and by agreeing to manage and assist in the improvement and expansion of the software and the operations of OWL.

12. On June 17, 2014, and in reliance upon their friendship and upon Salemme's representations and experience, Frybarger, Salemme and OWL agreed (both verbally and in writing) that Frybarger would invest $50,000 for a 50% ownership stake in OWL and that Frybarger would manage and assist in the improvement and expansion of the software and

operations of OWL. This agreement was memorialized in writing. See Exhibit A, Term Sheet and Shareholder Agreement agreed by Frybarger, Salemme and OWL (the "Shareholder Agreement").

13. In 2014 and 2015, and in reliance upon Salemme's continued representation that delivery to Frybarger of his 50% ownership interest in OWL was merely a matter of paperwork, Frybarger continued to make financial investments in managing and substantially improving the software and operations of OWL. Despite the Shareholder Agreement, neither Salemme nor OWL ever delivered the shares representing 50% ownership of OWL to Frybarger. Indeed, Frybarger received zero shares of stock in OWL.

## The Settlement

14. On or about 2016, after Frybarger had made a significant financial investment, had provided sweat equity for the benefit of OWL, and had personally managed the substantial improvements and operational effectiveness and efficiency of the software, as well as the daily operations of OWL, Salemme reneged upon his representations and agreements with Frybarger, and refused to deliver, or to permit OWL to deliver, to Frybarger his 50% ownership interest in OWL (the "Dispute").

15. To induce Frybarger to settle the Dispute, Salemme and OWL offered to pay certain amounts to Frybarger upon OWL achieving certain gross revenue thresholds and upon Salemme selling a portion of his ownership in OWL (the "Payment Promises").

16. To further induce Frybarger to settle the Dispute, Salemme and OWL offered to provide semi-annual reports to Frybarger and Johnson necessary to determine if, and when, such payment conditions were met ("Financial Reporting").

17. In reliance on Salemme's and OWL's representations, Payment Promises and Financial Reporting, Frybarger agreed to settle all claims that Frybarger had against Salemme and OWL stemming from the Dispute.

18. On June 28, 2016, via electronic signatures in Florida, Frybarger, his attorney Garry Johnson, Salemme and OWL entered into an agreement in settlement of the Dispute (the "Settlement Agreement") (attached hereto as Exhibit B).

## Payments And Gross Revenues

19. Pursuant to Sections 1, 2 and 3 of the Settlement Agreement, Frybarger was and is entitled to certain payments upon the achievement of certain conditions as follows:

   a. $60,000 was due and payable to Frybarger from Salemme upon signing of the Settlement Agreement. This amount was paid in full on or about June 28, 2016.

   b. $250,000 was due and payable to Frybarger from OWL upon OWL achieving $10 million in gross revenues ("Gross Revenues") defined as follows:

   > "any monies or anything of value paid for any service or product provided by One Way Limo.com or any Operating Affiliate (as hereinafter defined), any sales proceeds, contract payments, proceeds receipts, moneys or value of any kind in connection with any sale of ownership interest in, or any merger involving, or any sale of assets, businesses or operations of, One Way Limo.com or any Operating Affiliate, and any monies or other things of valued received by One Way Limo.com, but shall not include any "non-OWL" revenues, meaning revenues which are received by a third party entity or an Operating Affiliate from any third party customer which revenue is generated as a result of the third party entity or operating Affiliate's licensing agreement to utilize any reservation software owned by One Way Limo.com."

In the event such amount was not paid within 30 days of the date due, the amount was increased to $375,000. See Settlement Agreement ¶ 2(a) and ¶ 5.

   c. $250,000 was due and payable to Frybarger from Salemme upon Salemme selling or transferring interests in OWL for more than $1 million. In the event such amount was not paid within 30 days of the date due, the amount was increased to $375,000. Settlement Agreement ¶ 2(b) and ¶ 5.

   d. $500,000 was due and payable to Frybarger upon OWL achieving $20 million in Gross Revenues. In the event such amount was not paid within 30 days of the date due, the amount was increased to $750,000. Settlement Agreement ¶ 3 and ¶ 5.

**"Financial Reporting"**

20. The "Financial Reporting" was memorialized in Section 6 of the Settlement Agreement, which states the following:

> "One Way Limo.com **shall, on or before July 1st and February 1st of each year provide to Scott Frybarger** and Garry Johnson **reports of cumulative gross revenue of One Way Limo.com and any Operating Affiliate, for the six month period ending June 30th and December 31st prior to the due dates**, as well as any issuance, sales or purchases of ownership interest to Joseph Salemme and/or any immediate family member of Joseph Salemme, which reports shall include gross revenues from June 1, 2014."

21. There were no conditions or requirements to the delivery of the Financial Reporting.

**"Operating Affiliate"**

22. The Settlement Agreement further authorized OWL to enter into franchise, distribution, licensing, partnership or similar agreements with any third party, including an Operating Affiliate, to provide services normally provided by OWL in any other state or country. Settlement Agreement ¶ 2(d).

23. Per the Settlement Agreement, any Gross Revenues received by any franchisee, distributor, licensee, partnership or similar person or entity located in the States of New York, Connecticut, and New Jersey, and any such person or entity located outside the States of New York, Connecticut and New Jersey in which Salemme or an immediate family member of his holds an interest in said person or entity are included in the calculation of Gross Revenues. *Id*.

24. The Settlement Agreement defined "Operating Affiliate" as any entity or person which purchases, licenses, operates, or uses any proprietary software of OWL in New York, Connecticut, and New Jersey (or if outside those states, in which Salemme or an immediate family member holds an interest). *Id*.

25. On or about February 2019, Salemme and other shareholders and directors of OWL formed an Operating Affiliate - Luxy with substantially the same shareholders, directors, and officers as OWL, to which OWL purportedly transferred substantially all of its assets and liabilities.

26. In February 2019, Salemme and OWL tried to circumvent the Settlement Agreement by modifying the software, but upon information and belief, Luxy still uses the essence of the software Plaintiff developed for OWL. Indeed, OWL recognized as much by reporting Luxy revenues in its financial reporting while failing to disclose the transfer to Luxy.

27. Since Salemme is a party to the Settlement Agreement and Salemme is the principal of Luxy, Luxy is subject to the same Financial Reporting as OWL.

28. Further, upon information and belief, the transfer of substantially all of the assets and liabilities of OWL to Luxy constituted a "fraudulent transfer" as set forth in Count Three and was intended by Salemme and OWL to defraud, hinder and diminish the contractual rights of Frybarger as a creditor of OWL.

## Defendants Breached The Financial Reporting Requirements
## Of The Settlement Agreement

29. From the inception of the Parties' execution of the Settlement Agreement, Salemme and OWL have failed to deliver these semi-annual reports timely (only delivering cursory reports after, and only upon, Frybarger's demand of these reports. In response, Defendants produced cursory reports which appear to be inconsistent and incomplete ("Cursory Reports").

30. In the Financial Reporting, Gross Revenues and the facts surrounding credit card charges and payments to limousine providers appear to be understated, misstated, or intentionally withheld and the terms and conditions surrounding the transfer of OWL's assets and liabilities to Luxy have been withheld ("Financial Discrepancies").

31. Plaintiffs have requested, and Salemme, OWL and Luxy have refused, the delivery of the required Financial Reporting to Plaintiffs and justification for the Financial Discrepancies.

32. Defendants have created deliberate, unnecessary, unwarranted, and unreasonable obstacles to providing Plaintiffs with the necessary information for Plaintiffs to determine if, and when, amounts might be due and payable to Plaintiffs under the Settlement Agreement.

33. Defendants have demonstrated bad faith and the intention to deprive Frybarger of his contractual right to the previously agreed upon Financial Reporting and the payments due to Frybarger under the Settlement Agreement.

34. Defendants have demonstrated bad faith and the intention to deprive Frybarger of his contractual right to the previously agreed upon Financial Reporting and the payments due to Plaintiff under the Settlement Agreement as further evidenced by the "fraudulent transfer" to Luxy of substantially all of the assets and liabilities of OWL.

## COUNT I

### (Breach Of Contract Against All Defendants)

1-34. Plaintiff re-alleges the allegations as set forth in paragraphs 1-34 as if fully set forth herein.

35. Defendants have failed to comply with Plaintiff's requests for information to which Plaintiff is entitled under the Settlement Agreement and which is necessary to determine if, and when, amounts might be due and payable to Plaintiff under the Settlement Agreement.

36. The information requested by Plaintiff was and is necessary for Plaintiffs to determine if, and when, amounts might be due and payable to Plaintiff under the Settlement Agreement.

37. Plaintiff is entitled to the information requested and to a full accounting and to full payment of all amounts due Plaintiff under the Settlement Agreement.

38. Since the initial $60,000 payment in 2016 paid upon signing of the Settlement Agreement, Defendants have failed to pay Plaintiff anything under the Settlement Agreement even though Luxy has had millions of dollars of sales during the past seven years.

39. Luxy is an Operating Affiliate under the Settlement Agreement and thus bound to the terms of the Settlement Agreement.

40. These actions by Defendants constitute material breaches of the Settlement Agreement.

41. Pursuant to paragraph 27 of the Settlement Agreement, Plaintiff is entitled to recover his reasonable attorney's fees.

42. Pursuant to Conn. Gen. Stat. §37-3a, Plaintiffs are entitled to interest on the funds wrongfully detained.

43. Plaintiff has been damaged by these actions of the Defendants.

## COUNT II

### (Tortious Interference With Contract Against Salemme)

1-43. Plaintiff re-alleges the allegations as set forth in paragraphs 1-43 as if fully set forth herein.

44. In April 2019, Salemme was fully aware of the Settlement Agreement and OWL's obligations to Frybarger.

45. By causing OWL to transfer substantially all of its assets and its customer relationships to Luxy, Salemme intentionally interfered with Frybarger's contract with OWL.

46. By causing OWL to transfer substantially all of its assets and customer relationships to Luxy, Salemme maliciously intended to cause OWL to fail to pay Frybarger.

47. By fraudulently concealing the transfer from Frybarger until November 2, 2019, Salemme tolled the statute of limitations pursuant to Conn. Gen. Stat. §52-595.

48. Salemme's interference with Frybarger's contract with OWL was willful, wanton and/or malicious.

49. As a result of Salemme's interference, Frybarger has been damaged.

## COUNT III

### (Fraudulent Transfer Pursuant To Conn. Gen. Stat. §52-552e(a)(1))

1-49. Plaintiff re-alleges the allegations as set forth in paragraphs 1-49 as if fully set forth herein.

50. In April 2019, OWL transferred all of its assets to Luxy (the "Luxy Transfer") while indebted to Frybarger.

51. Pursuant to Conn. Gen. Stat. §52-552e(b), among the "badges of fraud" present in the case of the Luxy Transfer are: (a) Luxy is an "insider" as defined by Conn. Gen. Stat. §52-552b(7); (b) Salemme retains control of the assets transferred through his effective control of Luxy; (c) the Luxy Transfer was concealed from Frybarger for 7 months despite the Settlement Agreement; (d) the Luxy Transfer was of substantially all of OWL's assets; (e) OWL received less than reasonably equivalent value for the assets transferred; (f) OWL was insolvent at the time of the Luxy Transfer.

52. OWL made the Luxy Transfer with the actual intent to hinder, delay or defraud creditors, including Frybarger.

53. The Luxy Transfer was fraudulent as to Frybarger, pursuant to Conn. Gen. Stat. §52-552e(a)(1).

54. Pursuant to Conn. Gen. Stat. §52-552e(a)(1) and Conn. Gen. Stat. §52-552h(a)(1), Frybarger can avoid the Luxy Transfer.

55. Pursuant to Conn. Gen. Stat. §52-552i(b), Frybarger is entitled to damages against Luxy in the amount of the fair market value of the assets transferred to Luxy.

## COUNT IV

**(Constructive Fraudulent Transfer)**

1-55. Plaintiff re-alleges the allegations as set forth in paragraphs 1-55 as if fully set forth herein.

56. At the time of the Luxy Transfer, OWL was insolvent or rendered insolvent by the Luxy Transfer.

57. OWL did not receive reasonably equivalent value in return for the Luxy Transfer.

58. The Luxy Transfer was fraudulent as to Frybarger pursuant to Conn. Gen. Stat. §52-552f(a).

59. Frybarger can avoid the Luxy Transfer pursuant to Conn. Gen. Stat. §52-552h(a)(1).

60. Pursuant to Conn. Gen. Stat. §52-552i(b), Frybarger is entitled to damages against Luxy in the amount of the fair market value of the assets transferred to Luxy.

## COUNT V

### (CUTPA)

1-60. Plaintiff re-alleges the allegations as set forth in paragraphs 1-60 as if fully set forth herein.

61. At all relevant times, Salemme was engaged in trade or business in Connecticut.

62. By entering into the Settlement Agreement, then causing OWL to transfer its assets to Luxy, Salemme has engaged in practices which are unfair or deceptive and which are immoral, unethical, oppressive, or unscrupulous in violation of Conn. Gen. Stat. §42-110b(a).

63. Frybarger has suffered an ascertainable economic loss as a result.

64. Pursuant to Conn. Gen. Stat. §42-110g(a), Frybarger is entitled to actual and punitive damages.

65. Pursuant to Conn. Gen. Stat. §42-110g(d), Frybarger is entitled to recover his reasonable attorney's fees and costs.

## COUNT VI

### (Breach Of The Duty Of Good Faith And Fair Dealing)

1-65. Plaintiff re-alleges the allegations as set forth in paragraphs 1-65 as if fully set forth herein.

66. In every contract, there is an implied covenant of good faith and fair dealing.

67. By transferring its assets to Luxy and by causing said transfer, OWL and Salemme have breached that covenant.

68. As a result of the breach of the covenant of good faith and fair dealing, Plaintiff has been damaged.

## COUNT VII

### (Breach Of Fiduciary Duty)

1-68. Plaintiff re-alleges the allegations as set forth in paragraphs 1-68 as if fully set forth herein.

69. As the parties control of all of the information concerning OWL's sales and as the party in sole control of whether OWL reached the revenue targets in the Settlement Agreement, OWL and Salemme owed the Plaintiff a fiduciary duty.

70. By causing the Luxy Transfer, OWL and Salemme have breached that fiduciary duty.

71. As a result of this breach of fiduciary duty, Plaintiff has been damaged.

## COUNT VIII

### (Successor Liability)

1-71. Plaintiff re-alleges the allegations as set forth in paragraphs 1-71 as if fully set forth herein.

72. Luxy has assumed all of the same business as OWL, has the same management as OWL, has received and has all of the assets of OWL for no payment.

73. Upon information and belief, Luxy uses software that is the same or derivative of the software developed by Plaintiff for OWL.

74. Upon the transfer of assets to Luxy, OWL ceased operations.

75. Pursuant to Connecticut law, Luxy is liable as a successor for the debts of OWL, including OWL's debts to the Plaintiff.

**WHEREFORE**, Plaintiff requests that this Court grant the following relief:

1. Determine and require that Defendants provide to Plaintiff the information requested by Plaintiff and a full accounting of, if and when, any amounts might have been, or be due to Plaintiff by Defendants, and that Defendants continue to provide similar information after judgment until all amounts due to Plaintiff under the Settlement Agreement are paid in full;

2. Damages;

3. Punitive damages at common law;

4. Avoidance of the Luxy Transfer pursuant to Conn. Gen. Stat. §52-552h(a)(1);

5. Damages pursuant to Conn. Gen. Stat. §52-552i(b);

6. Punitive damages pursuant to Conn. Gen. Stat. §42-110g(a);

7. Attorney's fees pursuant to Conn. Gen. Stat. §42-110g(d);

8. A judgment that Luxy is liable for OWL's debts to Plaintiff as successor to OWL;

9. Costs;

10. Interest pursuant to Conn. Gen. Stat. §37-3a; and

11. Such other relief as this Court deems appropriate.

        **PLAINTIFF**
        **SCOTT FRYBARGER**

By:    /s/ *Jeffrey Hellman*
        Jeffrey Hellman, Esq.
        Law Offices of Jeffrey Hellman, LLC
        195 Church Street, 10th Floor
        New Haven, CT 06510
        Tel.: 203-691-8762
        Fax: 203-823-4401
        jeff@jeffhellmanlaw.com
        Federal Bar No.: ct04102

## **CERTIFICATION OF SERVICE**

This is to certify that, on February 6, 2024, a copy of this proposed Second Amended Complaint with Exhibits A and B was sent by operation of the Court's CM/ECF system to the following:

Aimee Jennifer Wood
Mitchell & Sheahan, P.C.
999 Oronoque Lane, Suite 203
Stratford, CT 06614
awood@mitchellandsheahan.com

Robert Burdette Mitchell
Mitchell & Sheahan, P.C.
999 Oronoque Lane, Suite 203
Stratford, CT 06614
rmitchell@mitchellandsheahan.com

Jessica Slippen
Mitchell & Sheahan, P.C.
999 Oronoque Lane, Suite 203
Stratford, CT 06614
jslippen@mitchellandsheahan.com

By: /s/ *Jeffrey Hellman*
Jeffrey Hellman